# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| Richard Robin, | ) |
|     Plaintiff, | ) |
| | )   Case. No. 15 C 11377 |
| v. | ) |
| | )   Judge Ronald A. Guzmán |
| City of Zion, et al., | ) |
|     Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, Defendants' motion for summary judgment is granted in part and denied in part. The assault claim, Count IX, is dismissed without prejudice. Defendants' motion for summary judgment as to Counts I, II, III, IV, V, VI, VII, VIII, X, and XI is granted, and the Clerk is directed to enter judgment in favor of Defendants on those counts. All other pending motions are denied as moot. Civil case terminated.

## STATEMENT

Richard Robin brings an eleven-count complaint alleging various constitutional and state law violations in what apparently has been a long-running dispute with the City of Zion ("the City") as to the enforcement of its municipal code with respect to rental properties owned by Robin.

**Facts**

<u>General Background</u>

Plaintiff owns twenty rental units in the City: five adjacent buildings with each containing four residential units. (Pl.'s Resp. Defs.' Stmt. Facts, Dkt. # 103-5, ¶ 8.) The parties dispute whether the units are deemed townhomes or apartments for purposes of the City building code. (*Id*.)

Defendant Richard Ianson is the Director of Building and Zoning (also referred to as the "Director of Building Inspections") for the City. (Pl.'s Resp. Defs.' Stmt. Facts, Dkt. # 103-5, ¶ 8.) Ianson is responsible for the overall supervision of the City Building Department, enforcement of all ordinance provisions relating to buildings and zoning, ensuring all buildings and structures are in compliance with the City code, and performing other duties in the building codes. (*Id*.) Water meters fall within the building and zoning ordinances. (*Id*.) From 2011 to March 2015, the Building Department employed two property maintenance inspectors (also referred to as code enforcement or compliance officers) – defendants Robert Miller and Robert Surano. (*Id*. ¶ 10.) The Building Department issues citations for all City code violations,

including violations involving water. (*Id*. ¶ 12.)

Between 2008 and 2013, Plaintiff received the following building code violation notices or citations from the City: failure to have a work permit for a unit under construction (which was dismissed pursuant to settlement); four notices of violations for overflowing dumpsters and damaged dumpster enclosures (which Plaintiff corrected and for which he did not receive a citation or fine); a notice of violation for an unlicensed/inoperable vehicle on the property (which Plaintiff corrected and for which he did not receive a citation or fine); and a notice of violation that one of his properties was uninhabitable due to unfit living conditions (which he corrected and for which he did not receive a citation or fine). (*Id*. ¶¶ 19-26.) In addition, in March 2010, Plaintiff received a notice from the Illinois Workers' Compensation Commission ("IWCC") that he was required to carry workers compensation insurance. (*Id*. ¶ 21.) Plaintiff believes a City employee contacted the IWCC to report his failure to carry workers compensation insurance. (*Id*.) No adverse action was taken against Plaintiff by the IWCC. (*Id*.)

In 2013 and 2014, Plaintiff received several notices for violations of the City's vacancy code provision (§ 10-179) requiring owners to register property as vacant within 14 days of its becoming vacant and paying a registration fee of $175.00. (*Id*. ¶¶ 30-33.) Plaintiff also received several notices for violation of the City ordinance (§ 10-178) requiring that vacant buildings with damaged doors or windows be boarded up. (*Id*. ¶¶ 32-33.) A city hearing officer found that Plaintiff had committed certain of the violations and issued fines. (*Id*. ¶ 34.) The procedural history of these proceedings is set forth in more detail in the analysis section.

In 2015, Plaintiff also received several citations for having disconnected and removed water meters in several of the units he owned. (*Id*. ¶ 60). On October 22, 2015, the City voluntarily dismissed the water meter citation violations pursuant to an agreement with Plaintiff under which he would replace the water meters he removed. (*Id*. ¶ 61.)

<u>Plantiff Takes Photos of City Employees' Homes</u>

On April 17, 2014, Plaintiff was taking photos of City officials' homes, including Inspector Surano's, to use at the administrative hearing on the vacancy violations to show that the City did not enforce the Building Code against City employees. (Defs.' Resp. Pl.'s Stmt. Facts, Dkt. # 103-5, ¶ 65.) The parties' accounts of the events leading up to the arrest differ. Plaintiff testified that he pulled over to the side of a street and exited his car in order to take a photo of Surano's house. (*Id*. ¶ 66.) Plaintiff described his confrontation with Surano as follows:

> After I exited my vehicle, I took that first picture. Mr. Surano came flying around the corner. He stopped. When I say stopped, you know, a jerking motion of the truck so it wasn't a nice graceful stop. I had waited for him to pass. He didn't move. He was already stopped. So I proceeded to walk in front of the truck across the street to the sidewalk.

2

> I took a picture of his northern side of the property. I turned around. I was making an attempt to walk back across the street because I didn't even want to walk on the sidewalk in front of his house. So I wanted to make sure I was walking in the street. I gave him an opportunity to pass and he didn't.
>
> So I started to walk back to my truck, again, a good ten, 15 feet in front of him, and that's when he started to pull forward at me, literally scared the crap out of me, and we had some verbal exchange. I proceeded then to tell him I'm there just to take some pictures, and I'm out of there. I mean he continued with verbal abuse. And that was both ways.
>
> So I went back to my truck. I walked to the back of my truck, and now he was almost – you know, his truck, my truck. We were – basically, the trucks were side by side. I attempted to walk back across the street in front of him to the north side – or south side of his property. He inched forward again, more verbal exchange.
>
> That's when he got out of the truck. . . . He was on the phone when he got out of the truck. So he was calling 911, got out of the truck, came walking over to me, was talking on the phone at that time to 911. I went back to my truck, and I called 911.

(Defs.' Ex. 2, Robin Dep., at 97-99.)

Several officers appeared as Plaintiff was calling 911. (*Id.* at 105.) Sitting inside his truck, Plaintiff spoke to one of the officers briefly while the other two officers walked toward Surano's truck. (*Id.* at 118.) Plaintiff "went over everything" with the officer he was speaking to and said he called 911 because he felt threatened by Surano. (*Id.* at 119.) The officer who spoke with Plaintiff then joined the other two officers who were speaking with Surano. (*Id.* at 120.) After the officers talked to Surano for approximately five minutes, two of the officers met briefly between themselves, then walked up to Plaintiff's truck, and after asking him to exit the car, handcuffed him. (*Id.* at 121-22.) Plaintiff asked why he was being arrested, guessing that it was for disorderly conduct, to which the officers responded "yes." (*Id.* at 123.) While Plaintiff was in the process of being arrested, he asked to file a complaint against Surano because he felt threatened by him, but the officer told Plaintiff he could not file a complaint because "[t]hey don't arrest both parties." (*Id.* at 126.)

Plaintiff was then driven in the back of a police car to the police station where he was held for approximately 90 minutes. (*Id.* at 128-29, 133.) During processing, he "tried to explain [his] story again," and "brought up the fact that [he] wanted to file a complaint again," but Officer Ray, who was processing him, "just went uh-huh, uh-huh, uh-huh." (*Id.* at 129.) After bringing up the issue of wanting to file complaint a third time, Officer Ray told Plaintiff he could probably talk to a sergeant, to which Plaintiff responded, "Great." Plaintiff was given a citation

3

for disorderly conduct and released. (*Id*. at 132-33.) While being released, Plaintiff asked about speaking to the sergeant, and was told the sergeant was unavailable. (*Id*. at 131.) Plaintiff was then driven back to his car and he went home. (*Id*. at 133-34.) At no time after being released from custody did Plaintiff attempt to file a complaint against Surano. (*Id*. at 134.)

Prior to a court hearing on September 9, 2014, at which Plaintiff, Surano, and the three police officers were present, the City dismissed the disorderly charge against Plaintiff. (*Id*. at 137-38.) Additional facts will be discussed as necessary in the analysis of the legal issues as set forth below.

**Summary Judgment Standard**

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court construes all facts and inferences arising from them in favor of the non-moving party. *Calumet River Fleeting, Inc. v. Int'l Union of Operating Eng'rs*, Local 150, AFL–CIO, 824 F.3d 645, 647–48 (7th Cir. 2016). Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

**Analysis**

<u>Counts I (against the City and Inspector Miller for vacancy citations) and II (against the City, Director Ianson, and Inspector Ransom for water meter citations) – Equal Protection</u>

*Individual Liability*. Plaintiff's class-of-one equal protection claims are based on his allegations that rental buildings he owned were improperly targeted for vacancy and water meter violations by the City and certain of its employees. Defendants contend that these claims are barred by res judicata because Plaintiff had a full and fair opportunity to litigate the claims through the administrative review process and received a final judgment.

As to the vacancy citations, Plaintiff was cited both for violations of City Code § 10-179 (registration of vacant buildings with the City) and City Code § 10-178 (boarding up doors and windows in vacant buildings). Subsequently, on April 24, 2014, an administrative hearing officer found that Plaintiff violated both sections for his units at 2809 Galilee and 2823 Galilee, and that Plaintiff violated § 10-179 for his units at 2819 Galilee, 2843 Galilee, 2845 Galilee, and 2849 Galilee. The administrative hearing officer imposed a fine of $250.00 per day for each of the violations. (Defs. Ex. 8, Pl.'s Compl. Admin. Review, Dkt. # 99-8, ¶ 28.) Plaintiff appealed the decision by filing a complaint for administrative review in the Lake County Circuit Court, which affirmed all findings of violation and fines under § 10-179, but reversed the findings that the units at 2809 Galilee and 2823 Galilee violated § 10-178. (Defs.' Ex. 9, 3/23/15 Mem.

4

Opinion Order, *Robin v. City of Zion*, No. 14 MR 0854, (Lake Cty. Cir. Ct.), Dkt. # 99-9, at 12.)

On appeal, the Illinois Appellate Court affirmed the lower court's order in almost all respects, finding that all but one of Plaintiff's units (2843 Galilee) was a vacant unit, and affirming with that one exception. (Defs'. Ex. 10, *Robin v. City of Zion*, 2016 Il App (2d) 151122-U, at *19 (July 6, 2016), Dkt. # 99-10.) The penalties affirmed by the appellate court totaled $127,500.00. (*Id.*) Plaintiff's Petition for Leave to Appeal to the Illinois Supreme Court was denied. (Defs.' Ex. 12, Dkt. # 99-12.)

"Three requirements must be satisfied for res judicata to apply: (1) a final judgment on the merits rendered by a court of competent jurisdiction, (2) an identity of cause of action, and (3) an identity of parties or their privies." *Richter v. Prairie Farms Dairy, Inc*., 53 N.E.3d 1, 8 (Ill. App. Ct. 2016). The doctrine of res judicata bars not only those issues actually decided in the prior suit, but all other issues which could have been decided. *Id*. Here, Plaintiff "could have raised his § 1983 claim [regarding the vacancy violations] in the circuit court because Illinois permits joining § 1983 claims with actions for review of administrative decisions." *Patterson v. Dimas*, No. 16-3223, 2017 WL 1359841, at *2 (7th Cir. Apr. 13, 2017). Thus, his equal protection claim based on the vacancy ordinance is barred by res judicata.

Plaintiff's contention that it would be inequitable to apply res judicata because the vacancy ordinance remains in place is unavailing. The Illinois Supreme Court has identified several instances in which the application of res judicata would be inequitable, including when "the case involves a continuing or recurrent wrong." *Hayes v. City of Chi*., 670 F.3d 810, 815 (7th Cir. 2012). According to Plaintiff, nothing prevents the City from continuing to enforce the vacancy ordinance against him. But Plaintiff does not point to any evidence that he has actually received any vacancy citations since those issued in the instant case. Nor does he challenge the ordinance's facial constitutionality, just whether or not it was properly applied to him, which he could have raised in state court. The Court is unpersuaded that simply because a law remains in effect, a party should be allowed to evade the res judicata effects of challenges to the law's past application.

The City asserts that the same preclusion result applies to Plaintiff's equal protection claim with respect to the water meter violations. Specifically, in July 2015, the City discovered that Plaintiff had removed and disconnected fifteen water meters in his buildings. (Pl.'s Resp. Defs.' Stmt. Facts, Dkt. # 103-5, ¶¶ 54-56.) Plaintiff claimed that he disconnected the water meters in order to use only one unit's meter in each building as the billing unit. (*Id*. ¶ 56.) The parties dispute whether Plaintiff needed the City's authorization or permits to remove the meters. Nevertheless, as a result of inspections by Inspector Ransom in August 2015, Director Ianson made the decision to issue citations against Plaintiff for violating City code provisions relating to the disconnection and removal of water meters: §§ 10-294.1, 10-296, 94-37, 94-42, 94-44, 94-82, and 94-352. Most specifically, § 94-44 states that "[i]t shall be unlawful for any person not authorized as an employee of the department of works to tamper with, alter, turn on or off the water supply . . . or damage any part of the city waterworks or supply system or any meter." Zion

Mun. Code § 94-44.

The parties agree that the City voluntarily dismissed the water meter citations based on Plaintiff's agreement to reinstall the water meters, and that he did not pay any fines. As the Seventh Circuit has noted, "[n]o preclusion doctrines, statutory or common law, operate in the absence of an underlying judgment or administrative finding. Illinois, like every other jurisdiction of which we are aware, requires at a minimum an administrative determination before it will apply preclusion doctrines." *Carver v. Nall*, 172 F.3d 513, 515 (7th Cir. 1999). "A settlement agreement that has not been integrated into a consent decree is not a judgment and cannot trigger res judicata." *Id*. Therefore, Plaintiff's agreement with the City to dismiss the citations in exchange for reinstalling the water meters does not trigger res judicata. Even assuming that the purported agreement (*i.e.*, settlement) had been incorporated into the dismissal order, the City fails to address whether Plaintiff could have brought a § 1983 claim before the municipal hearing officer in the action involving his water meter ordinance violations.[1] Therefore, the Court rejects the City's assertion that res judicata bars this aspect of Plaintiff's equal protection claim.

Defendants contend that the claim nevertheless fails on the merits. "The Equal Protection Clause guards against government discrimination on the basis of race and other immutable characteristics, but it also extends to protect people from so-called 'class-of-one' discrimination in which a government arbitrarily and irrationally singles out one person for poor treatment." *Brunson v. Murray*, 843 F.3d 698, 705 (7th Cir. 2016). "The classic class-of-one claim is illustrated when a public official, 'with no conceivable basis for his action other than spite or some other improper motive . . . comes down hard on a hapless private citizen.'" *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013) (citation omitted). "Generally speaking, a class-of-one plaintiff must prove that '(1) a state actor has intentionally treated him differently than others similarly situated, and (2) there is no rational basis for the difference in treatment.'" *Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, No. 15-2655, 2017 WL 2627819, at *2 (7th Cir. June 19, 2017).[2]

Plaintiff admits that he disconnected and removed the water meters without City authority or permits. (Defs.' Ex. 2, Robin Dep., Dkt. # 99-2, at 62:13-19.) He further admits that he does

---

[1] The Municipal Code for the City of Zion states that"[t]here is hereby created within the City of Zion a code hearing department, which is authorized to provide for and operate a 'system of adjudication,' . . . which shall have *jurisdiction over the adjudication and enforcement of any violation of the City Code*. . . ." Zion Mun. Code § 3-4 (emphasis added).

[2] The Seventh Circuit has indicated internal disagreement as to the elements that must be proved for success in a class-of-one equal protection case. *See Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887 (7th Cir. 2012) (en banc) (including three separate opinions regarding the elements of a class-of-one claim). In this order, the Court uses the Seventh Circuit's most recent statement of the elements as stated in *Amin Ijbara Equity Corp.,* 2017 WL 2627819, at *2.

not know if other property owners who removed water meters or reconfigured plumbing without City authority received similar citations. (Pl.'s Resp. Defs.' Stmt Facts, Dkt. # 103-5, ¶ 62.) Because Plaintiff has not pointed to evidence that he was treated differently than others similarly situated for having disconnected and removed water meters, his equal protection claim fails. *Black Earth Meat Mkt., LLC v. Vill. of Black Earth*, 834 F.3d 841, 851 (7th Cir. 2016) (rejecting Plaintiff's class-of-one equal protection claims in part because he had not "suggested a sufficiently similar comparator"). Plaintiff also appears to argue that he was treated differently than others similarly situated because he paid to have the water meters reinstalled in the units from which they were removed, and that other owners of rental units are not required to have individual meters in each unit. But this result was of his own making, as it is what he agreed to do in lieu of paying fines for having disconnected and removed water meters, an offense he admits to committing. While he testified that he believes he was "forced" into reinstalling the water meters (Defs.' Ex. 2, Robin Dep., at 72:24), there is no record evidence supporting that assertion. Indeed, he admits that he "voluntarily" agreed to put the water meters back "[b]ased on input from [his] counsel." (*Id*. at 5-8.)

Therefore, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's class-of-one equal protection claim based on the citations he received for having disconnected and removed water meters in certain of his rental units.

*Monell liability*. Plaintiff also seeks to implicate the City in his equal protection claims. "For municipal liability under § 1983, the constitutional violation must be caused by (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with 'final policymaking authority.'" *Milestone v. City of Monroe, Wis*., 665 F.3d 774, 780 (7th Cir. 2011) (citations omitted). Here, Plaintiff alleges that the City is liable based on the third prong – *i.e*., that Ianson and Miller were final policymakers and thus their conduct in selectively enforcing and citing him for violations of the City's building code violated his constitutional right to equal protection. Because Plaintiff did not respond to Defendants' argument that Miller is not a final policymaker for the City, the *Monell* claim in that regard is dismissed. *See Bonte v. U.S. Bank, N.A*., 624 F.3d 461, 466 (7th Cir. 2010) ( "Failure to respond to an argument—as the [plaintiff] ha[s] done here—results in waiver.").

With respect to Ianson, Plaintiff contends that as the Director of the City's Building and Zoning Department who oversees its day-to-day operations, including the compliance officers who issue citations, Ianson is a final policymaker for the City. Plaintiff also notes that Ianson directed Inspector Surano to enforce the vacancy and water meter ordinances based on Ianson's interpretation of what constituted a "dwelling unit" under the City's building code. "[S]imply because a municipal employee has decisionmaking authority, even unreviewed authority, with respect to a particular matter does not render him a policymaker as to that matter." *Ball v. City of Indianapolis*, 760 F.3d 636, 643 (7th Cir. 2014). "A municipality must have delegated authority to the individual to make policy on its behalf." *Id*. "[T]he following facts are helpful in determining whether an official is a final policymaker: '(1) whether the official is constrained by

the policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority.'" *Sowell v. Dominguez*, No. 2:09 CV 47, 2017 WL 1151088, at *16 (N.D. Ind. Mar. 27, 2017) (citation omitted).

The City's code provides that the "city government shall be divided into five departments as is provided by law, and each commissioner shall be the superintendent of a department" with the mayor as the "superintendent of the department of public affairs, and the other commissioners shall be allotted to the four other departments by the council as is provided by law." (Defs.' Ex. 23, Dkt. # 99-23, Zion Mun. Code § 2-35.) The City code further states that "[e]ach commissioner shall have authority to make the rules and regulations to govern the conduct of the officers and employees assigned to the department of which he is the superintendent," and "[s]uch rules shall be binding on and obeyed by all such officers and employees until and unless the rules are revoked or altered by the council or by the commissioner." (*Id*. § 2-42.) It is undisputed that Ianson reports to the commissioner in charge of the City's building department and that, while commissioners did not "typically" get involved in decisions by the building department, the commissioners have the authority to reverse a decision by Ianson. (Pl.'s Resp. Defs.' Stmt. Facts, Dkt. # 103-5, ¶ 9.) Finally, the City code states that "wherever in building regulations it is provided that anything must be done to the approval of or subject to the direction of, the director of building inspections ro any other officer of the city, . . . *no such provision shall be construed as giving any officer of the city discretionary powers as to what such regulations or standards shall be . . . .*" (Defs.' Ex. 23, Dkt. # 99-23, Zion Mun. Code § 10-3) (emphasis added).

Based on the above City code provisions, it is clear that Director Ianson is not a final policymaker for the City of Zion. Therefore, the Court grants Defendants' motion for summary judgment on the *Monell* claim.

Count III – First Amendment

Plaintiff alleges that his rights under the First Amendment were violated when he was prevented, upon his arrest, from taking photographs of Surano's house. In its order granting Plaintiff's motion to dismiss this count of the original complaint, the Court stated:

> "[T]he First Amendment provides at least some degree of protection for gathering news and information, particularly news and information about the affairs of government." *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 597 (7th Cir. 2012). However, "[t]he First Amendment only protects speech that addresses matters of public concern." *Linkmeyer v. M.S.D. Lawrence Twp. Sch. Corp.*, No. 1:13-CV-1144-WTL-DML, 2013 WL 6804750, at *3 (S.D. Ind. Dec. 20, 2013). "Construed broadly, 'matters of public concern' include anything 'that is a subject of legitimate news interest; that is, a subject of general interest and of value

8

concern to the public at the time of publication.'" *Id*. (citation omitted). "[T]he Seventh Circuit has made clear that speech does not address a matter of public concern unless it demonstrates some intent to draw public attention to a public issue." *Id*. For example, "the First Amendment offers no protection to speech the sole purpose of which is to bolster the plaintiff's position in a private personnel dispute–even if the speech relates in some manner to a matter of general societal interest." *Id*.

Robin alleges that he was gathering "evidence to support his defense of the citations issued on January 30, 2014." (Compl., Dkt. # 1, ¶ 31.) Thus, Robin's actions in photographing Surano's house are not protected by the First Amendment. While he argues that the issue of whether the City treats its employees more favorably than private citizens is "not a concern limited to the interests of Mr. Robin alone," (Resp., Dkt. # 35, at 8), he fails to point to any allegations supporting such a statement.

(6/29/16 Order, Dkt. # 40, at 4.)

In his First Amended Complaint, Plaintiff alleges that:

> 61. Police Officers and Mr. Surano, acting under the color of state law, have deprived Mr. Robin of his constitutional right of freedom to gather information under the First Amendment of the U.S. Constitution.
>
> 62. Mr. Robin informed Mr. Surano and the Police Officers that he was at Mr. Surano's home in order to gather information related to the activity of the City, specifically its enforcement and lack of enforcement of certain building code provisions.
>
> 63. Mr. Robin's information gathering was undertaken with the intent to build evidence for his administrative hearing as well as to determine whether the City was treating its employees more favorably than private citizens, to expose the City's uneven enforcement of its City codes in favor of City officials and the harassment of a private citizen and landlord in the City.
>
> 64. The Police Officers' spoke to Mr. Surano after Officer Ray Jr. concluded speaking with Mr. Robin.
>
> 65. Police Officers unlawfully arrested Mr. Robin after they concluded speaking to Mr. Surano.

9

> 66.[3] The Police Officers unlawfully arrested Mr. Robin and refused to accept Mr. Robin's criminal assault complaint against Mr. Surano in order to deter and retaliate against him from gathering information against the City and Mr. Surano.
>
> 67. The Police Officers and Mr. Surano's unlawful arrest of Mr. Robin and the Police Officers' refusal to accept a complaint against Mr. Surano deprived Mr. Robin of his first amendment rights and deterred him from further gathering of information related to the activity of the City.

(1st Am. Compl., Dkt. # 45, Am. Count III, ¶¶ 61-67, at 14-15.)

While alluding in these allegations to his intent to publicly reveal improper enforcement of the City's code by City officials, Plaintiff points to no record evidence that he was attempting to "draw public attention to a public issue." *Linkmeyer*, 2013 WL 6804750, at *3. Plaintiff acknowledges in his additional statement of facts that his "purpose in taking photos was to gather evidence related to the City engaging in improper conduct and discriminating against him." (Defs.' Resp. Pl.'s Stmt. Facts, Dkt. # 111, ¶ 31.) Indeed, Plaintiff stated in his deposition that his intent in taking the photographs was for use in the administrative hearing being held pursuant to the citations issued *against him* for his purported City code violations. (Defs.' Ex. 2, Robin Dep, at 87: 4-8, 108:5-8) (emphasis added). As the Court noted in its order on the motion to dismiss the complaint, "the First Amendment offers no protection to speech the sole purpose of which is to bolster the plaintiff's position in a private personnel dispute-even if the speech relates in some manner to a matter of general societal interest." *Linkmeyer*, 2013 WL 6804750, at *3. Plaintiff's assertion in the affidavit attached to his response that he was attempting to expose the City's inconsistent application of its ordinances is unsupported by the record and therefore does not create a genuine issue of material fact on this claim. *Duah v. ABM Parking Servs., Inc.*, No. 15 C 1205, 2016 WL 4530309, at *5 (N.D. Ill. Aug. 30, 2016) ("A plaintiff's conclusory statements in an affidavit, unsupported by the evidence of record, do not suffice to avoid summary judgment."). Accordingly, the motion for summary judgment as to Count III is granted.

<u>Count IV – Conspiracy to Prevent Plaintiff from Gathering Evidence</u>

Because there is no underlying constitutional violation with respect to Plaintiff's gathering of evidence, the conspiracy claim related to the same allegations fails. *Ewell v. Toney*, 853 F.3d 911, 918 (7th Cir. 2017) ("[T]here must be an underlying constitutional injury or the conspiracy claim fails.")

<u>Count V – First Amendment –Denial of Access to Courts</u>

---

[3] In the First Amended Complaint, paragraphs 66 and 67 of this count are improperly numbered as 64 and 66. The Court corrected the numbering in its quotation as well as at least one minor punctuation error.

Plaintiff also contends that his right of access to the courts was blocked when the officers prevented him from filing a complaint against Surano for purportedly attempting to hit Plaintiff with his truck. The Court dismissed this claim, which was included as Count V in the original complaint, for failure to state a claim, and Plaintiff pleaded no new facts regarding this claim in his amended complaint.

As noted by the Seventh Circuit, "[j]udicial access must be 'adequate, effective, and meaningful.'" *Vasquez v. Hernandez*, 60 F.3d 325, 328 (7th Cir. 1995) (quoting *Bounds v. Smith*, 430 U.S. 817, 822 (1977)). The Court concludes that Plaintiff has failed to point to evidence establishing that the actions of the police officers rose to the level of a constitutional violation. *Id*. at 329 (noting that "the constitutionality of [an] act [precluding or delaying access to the courts] may . . . depend on other contextual factors including the passage of time") Plaintiff contends that he was rebuffed by City police officers when he tried to file a complaint against Surano. However, he also testified that upon pursuing the request while at the Zion police station, Officer Ray told him he could probably speak with a sergeant, who was not available at the time of Plaintiff's release. Despite being provided a possible avenue by which he could obtain the relief he was seeking, Plaintiff admits that he made no attempt to file a complaint at any time after leaving the police station in April 2014. Because Plaintiff has failed to raise a genuine issue of material fact demonstrating that he was deprived of his right to seek judicial relief, the Court grants Defendants' motion for summary judgment on this claim.

Count VI – § 1983 Conspiracy to Deny Access to the Courts

Because there is no underlying constitutional violation with respect to Plaintiff's claim of a denial of access to the courts, the conspiracy claim related to the same allegations fails. *Ewell*, 853 F.3d at 918 ("[T]here must be an underlying constitutional injury or the conspiracy claim fails.")

Counts VII & X – § 1983 and State Law False Arrest Claims

The existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police officer for false arrest. *Mustafa v. City of Chi*., 442 F.3d 544, 547 (7th Cir. 2006). "Probable cause to justify an arrest exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott v. Sangamon Cty., Ill*., 705 F.3d 706, 714 (7th Cir. 2013). Illinois law provides that "[a] person commits disorderly conduct when he knowingly . . . [d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace. . . ." 720 Ill. Comp. Stat. 5/26–1(a)(1). "To commit disorderly conduct, 'a person must engage in conduct that: (1) is unreasonable; (2) alarms or disturbs another; and (3) threatens to provoke or provokes a breach of the peace.'" *Thayer v. Chiczewski*, 705 F.3d 237, 248 (7th Cir. 2012) (citation omitted).

Officer Ray, the arresting officer, testified in his deposition that upon arriving at the scene

11

of the incident, both Surano and Plaintiff were out of their vehicles and that "it was clear that they were both upset." (Defs.' Ex. 6, Ray Dep., at 55.) After directing Surano and Plaintiff to separate and return to their cars, Ray approached Plaintiff's truck. (*Id*. at 56.) According to Ray, Plaintiff "got out of his vehicle as [Ray] approached him, clearly agitated, walking very directly towards me, again, red in the face and talking in a louder-than-normal voice" and "was very upset." (*Id*. at 57.) Ray testified that he asked Plaintiff what had happened:

> He said that he had come there to take photographs of Mr. Surano's home and that he was doing so from the roadway, and he never went on [Surano's] property. And during that time, he also produced a – I can't remember if it was typed or handwritten, but a list of building department employees and City council members. It had their addresses, their home addresses on it. And he said that it was his intention to take pictures of all of these locations because it was his right to do that.

(*Id*.) Ray stated he then went over to speak with Surano "to get his side of the incident." (*Id*. at 64.) According to Ray, Surano indicated that:

> he was coming home from work and . . . from the alleyway off the back side of his house, he observed [Plaintiff], who was known to him, to be in front of his house taking pictures. [Surano] drove around the house to address [Plaintiff] as to why he felt he needed to take pictures of his home.

(*Id*.) Ray testified that Surano said that "[Plaintiff] was upset" and as the discussion between them progressed, "it got louder and . . . [Plaintiff] had used language that caused [Surano] to be in fear of possibly being assaulted." (*Id*. at 67.) Ray stated that Surano said that Plaintiff "got right up in [Surano's] face" and told him, "Go fuck yourself." According to Ray, Surano also told Ray that he was "upset that [Plaintiff] was in front of his home, and he had no idea what he would be doing there, that he has a wife and children at the home" and "that he's worried about their safety." (*Id*. at 68.) Ray further testified that while Plaintiff complained that Surano had driven in a threatening manner toward Plaintiff, Ray concluded that Plaintiff was the "instigator" because "[h]is initial actions caused the actions of Mr. Surano." (*Id*. at 63.) Finally, in his report of the arrest, Ray wrote that Surano advised him "that there had been an ongoing dispute between the Zion Building Department and Robin lasting several years." (Defs.' Ex. 21, 4/18/ 2014 Case Report, at Zion 1980.) At his deposition, however, Ray stated that it was his "understanding that in the past, [Plaintiff] has been at City Hall in an upset fashion," but that he only "learned that since the time of the call." (Defs.' Ex. 6, Ray Dep., at 68.) Thus, it is not clear whether Ray knew at the time of the arrest that there had been ongoing animosity between Plaintiff and the City Building Department.

"An arrest for disorderly conduct is justified when the defendant directly harasses or threatens other people." *Reher v. Vivo*, 656 F.3d 772, 777 (7th Cir. 2011). It is true as Plaintiff notes that Illinois court have stated that "videotaping in public [here, taking photographs] in and

12

of itself may not give probable cause to arrest a person for disorderly conduct." *Graham v. Vill. of Niles*, No. 02 C 4405, 2003 WL 22995159, at *6 (N.D. Ill. Dec. 16, 2003). However, "Illinois courts have sustained arrests for disorderly conduct where the videotaping was accompanied by other suspicious circumstances." *Id*. Moreover, "[w]here words . . . form the basis for a disorderly conduct charge, they must be 'fighting words' and contain an implied or explicit threat of violence." *Johnson v. City of Rock Island, Ill*., No. 4:11CV04058SLDJEH, 2014 WL 4473727, at *10 (C.D. Ill. Sept. 11, 2014) (citation omitted). "Fighting words are 'personally abusive epithets which, when addressed to an ordinary citizen, as a matter of common knowledge, are inherently likely to provoke violent reaction.'" *Id*. (citation omitted).

Here, while it was not illegal for Plaintiff to take photographs of Surano's home, that is not all that occurred. Ray testified that after being dispatched to the scene:

- He arrived to find Plaintiff and Surano facing each other a few feet apart and they both appeared upset

- After directing each person to go back to his own car, he approached Plaintiff, who was agitated, very upset, and red in the face

- Plaintiff was speaking in a louder-than-normal-voice and explained that he had a list of the personal addresses of City employees and City council members so that he could take photos of their homes in preparation for an upcoming administrative hearing with the City

- As noted by Plaintiff, Surano told Ray "prior to the arrest that the City had ongoing problems with [Plaintiff] back and forth, [Plaintiff] filed complaints, and that was an active thing going on in the building department" (Pl.'s Stmt. Add'l Fact, Dkt. # 103-5, Page 30 of 38, ¶ 8.)

- Surano told Ray that "[Plaintiff] was upset" and as the discussion between Plaintiff and Surano progressed, "it got louder and . . . [Plaintiff] had used language that caused [Surano] to be in fear of possibly being assaulted," specifically, Surano told Ray that Plaintiff "got right up in [Surano's] face" and told him, "Go fuck yourself"

- Surano also told Ray that he was "upset that [Plaintiff] was in front of his home, and he had no idea what he would be doing there, that he has a wife and children at the home" and "that he's worried about their safety"

Based on these facts, the Court concludes that Ray had probable cause to arrest Plaintiff for disorderly conduct. As far as Ray knew, he had arrived at a scene where Plaintiff and Surano, who both appeared upset, were standing in the street facing each other. After questioning both men, he learned that Plaintiff, who had a continuing dispute with the City, was found by Surano

13

upon his return from work as a City employee to be taking photos of Surano's home, which caused Surano to feel concerned for the safety of his family. Plaintiff, who was visibly quite agitated and upset, and speaking in a loud voice, had told Surano, "Go fuck yourself." Given the circumstances, Ray could reasonably conclude that Plaintiff's conduct and words "could tend to incite an immediate breach of the peace." *Gower v. Vercier*, 377 F.3d 661, 670 (7th Cir. 2004) (noting that "the emphasis of the [disorderly conduct] statute is upon the tendency of the conduct to disturb others and to provoke disruptions of public order and upon the unreasonableness of the activity when viewed in the context of the surrounding circumstances") (citation omitted); *Redwood v. Dobson*, No. 00-2305, 2005 WL 5176860, at *12 (C.D. Ill. Oct. 12, 2005) (finding that officers could reasonably conclude that plaintiff had committed a hate crime predicated on disorderly conduct when he yelled across the street calling an African-American man "shoe-shine boy," and the man stated he was alarmed and disturbed and had previously reported being harassed and insulted by plaintiff). Indeed, Plaintiff and Surano themselves believed that the situation could escalate given that they both called 911 within minutes of Surano arriving at his house and confronting Plaintiff.

The Court therefore grants Defendants' motion for summary judgment as to both the § 1983 and state law false arrest claims.

### Count VIII – § 1983 Conspiracy to Commit False Arrest

Because there is no underlying constitutional violation with respect to Plaintiff's claim of false arrest, the conspiracy claim related to the same allegations fails. *Ewell,* 853 F.3d at 918 ("[T]here must be an underlying constitutional injury or the conspiracy claim fails.")

### Count IX – Assault

Defendants contend that the assault claim is time-barred under Illinois Local Governmental and Governmental Employees Tort Immunity Act, which states:

> No civil action . . . may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued.

745 Ill. Comp. Stat. 10/8-101. Under the Tort Immunity Act, the one-year statute of limitations applies to "'public employee[s] acting within the scope of their employment.'" *Snyder v. Vill. of Midlothian*, 302 F.R.D. 231, 234 (N.D. Ill. 2014) (citation omitted). A genuine issue of material fact exists as to whether Surano was acting within the scope of his employment as a city inspector when the incident occurred. (Pl.'s Resp. Defs.' Stmt. Facts, Dkt. # 103-5, ¶ 69 (while Defendants point to Surano's testimony that his work hours were 8 a.m. to 5 p.m. and that immediately before the incident he was responding to a citizen's complaint near his home involving windblown debris, Officer Ray testified that Surano told him he was returning home after work when Surano saw Plaintiff outside his house)).

14

Under Illinois law, assault is defined as "'an intentional, unlawful offer of corporal injury by force, or force unlawfully directed, under such circumstances as to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented.'" *Winkfield v. Dean*, No. 14-CV-584-SMY-RJD, 2017 WL 2418719, at *4 (S.D. Ill. June 5, 2017) (citation omitted). Plaintiff testified that as he began to cross the street back to his own truck, Surano "started to pull forward at me, literally scared the crap out of me," and a few moments later, Surano "inched forward again . . ." (Defs.' Ex. 2, Robin Dep., at 98.) Surano testified that Plaintiff walked behind his truck, and that he "proceeded to move forward" to call the Zion Police Department. (Defs.' Ex. 5, Surano Dep., at 178.) Construing this testimony in a light most favorable to Plaintiff, a genuine issue of material fact exists as whether an assault occurred.

Therefore, Defendants' motion for summary judgment on the assault claim is denied.

Count XI – Malicious Prosecution

"'To establish a claim for malicious prosecution under Illinois law, plaintiffs must establish five elements: (1) commencement or continuation of an original proceeding [by the defendant]; (2) termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause; (4) malice; and (5) damages.'" *Colbert v. City of Chi.*, 851 F.3d 649, 654–55 (7th Cir. 2017) (quoting *Cairel v. Alderden*, 821 F.3d 823, 834 (7th Cir. 2016)). "The failure to establish any one element bars recovery." *Cairel*, 821 F.3d at 834.

Because the Court has concluded that Ray had probable cause to arrest Plaintiff, this claim fails. Accordingly, the Court grants Defendants' motion for summary judgment on this count.

**Conclusion**

For the reasons stated above, Defendants' motion for summary judgment is granted in part and denied in part. Defendants' motion for summary judgment is granted as to all counts except for Count XI, the state law assault claim. Because the Court lacks original jurisdiction over the assault claim brought under state law, the Court declines to exercise supplemental jurisdiction over it. *See* 28 U.S.C. § 1367(c)(3); *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 906 (7th Cir. 2007).[4] The assault claim, Count IX, is therefore dismissed without prejudice.

---

[4] The Court notes that "[a]s a general matter, when all federal claims have been dismissed prior to trial, the federal court should relinquish jurisdiction over the remaining pendent state claims." *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007). This general rule has three exceptions: "when the refiling of the state claims is barred by the statute of limitations; where substantial judicial resources have already been expended on the state claims; and when it is clearly apparent how the state claim is to be decided." *Id*. None of the exceptions applies here. The statute of limitations is an issue yet to be resolved, and if the limitations period

15

The Clerk is directed to enter judgment in favor of Defendants as to Counts I, II, III, IV, V, VI, VII, VIII, X, and XI. All pending motions are denied as moot. Civil case terminated.

**Date**: June 29, 2017

                                                    **Ronald A. Guzmán**
                                                    **United States District Judge**

---

expired while the case was pending here, Illinois law would give Plaintiff one year to refile the claim in state court. *Hunte v. Safeguard Properties Mgmt., LLC*, No. 16 C 11198, 2017 WL 2445137, at *4 (N.D. Ill. June 6, 2017). Nor have substantial resources been expended on the assault claim by this Court and any discovery conducted by the parties is transferrable to any state court action. Finally, it is not clearly apparent how the assault claim is to be decided.